# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SPX CORPORATION,
a Delaware corporation,

      Plaintiff,

vs.

|  |  |
|---|---|
| | Civil Action No. 2:06-cv-14888 |
| BARTEC USA, LLC | Hon. David M. Lawson |
| a Michigan company, | Mag. Judge Steven D. Pepe |

BARTEC AUTO ID LIMITED,
a United Kingdom corporation,
SCHRADER-BRIDGEPORT INTERNATIONAL, INC.,
A Delaware corporation,
GENERAL PARTS, INC.,
A North Carolina corporation, and
MYERS TIRE SUPPLY DISTRIBUTION, INC.
An Ohio corporation,

      Defendants.

_____/

# DEFENDANTS BARTEC USA, LLC, BARTEC AUTO ID LIMITED, SCHRADER-BRIDGEPORT INTERNATIONAL, INC., AND MYERS TIRE SUPPLY DISTRIBUTION, INC.'S MOTION FOR SUMMARY JUDGMENT UNDER FED R. CIV. P. 56

In this patent infringement action, Plaintiff SPX Corporation alleges that the Defendants infringe the rights of U.S. Patent No. 6,904,796 to Pacsai *et al.* (Pacsai '796)  Plaintiff claims that the Bartec DBL, DEG, and DSW tools (the accused tools) infringe Pacsai '796.  Plaintiff alleges that the sale of the Bartec DBL and the Bartec DEG tools infringes claims 1, 4, 7-12 and 17-19, and that the sale of the Bartec DSW infringes claims 1, 4, 7-12 and 20-22.  Defendants have counterclaimed that Pacsai '796 is invalid and not infringed.

Defendants move this Court for summary judgment on three bases: (1) that all asserted claims of Plaintiff's patent, U.S. Patent No. 6,904,796 to Pacsai *et al.* ("Pacsai '796") are invalid based on the Court's holding that the term "means for generating modulated signals" is void for indefiniteness; (2) that the accused tools do not infringe any of the asserted claims of Pacsai '796; and (3) that all claims of Pacsai '796 are obvious and thus invalid in view of the prior art.

As set forth in detail in Section I of Defendants' Brief in Support, claims 1-15 and claims 17-22 are invalid for failing to particularly point out and distinctly claim the alleged invention. The Court has held that the claim term "means for generating modulated signals" is void as indefinite.  *See* Op. and Order Construing Claims and Modifying Case Management Order, p. 37 (DKT #156, "Claim Construction Order).  This limitation appears in all of the asserted claims as construed.   Claim Construction Order, p. 11.   Consequently, all of the asserted claims are indefinite and invalid under 35 U.S.C. § 112, ¶ 2.  *See* Defendants' Brief in Support, Section I, *infra*.  Defendants are entitled to an order granting summary judgment that the asserted claims are invalid.

As set forth in detail in Section II of Defendants' Brief in Support, Plaintiff cannot establish that the accused tools infringe any asserted claim of Pacsai '796.  The claims as

construed require two or more different means selected from the following: "[1] a magnet, [2] a valve core depressor, [3] means for generating continuous wave signals, and [4] means for generating modulated signals."   Claim Construction Order, pp. 11-12.    As stated above, the claim term "means for generating modulated signals" is void for indefiniteness.  Of the three remaining enumerated means, it is undisputed that the accused tools do not possess either a magnet or a valve core depressor.  For this reason, Plaintiff cannot establish that the accused tools possess "two or more different means" from the enumerated four.  Further, even Plaintiff's expert admits that the accused tools have only a single structure for activating tire sensors.  *See* Defendants' Brief in Support, Section II.B.2, *infra*.  In addition, Plaintiff is unable to meet its burden to establish that the tools perform certain of the steps recited by claims 17-19 and 20-22.  *Id.* at Section II.C and D, *infra*.  Defendants are entitled to an order granting summary judgment that the asserted claims are not infringed by the accused tools.

 As set forth in detail in Section III of Defendants' Brief in Support, the tools and methods recited in the claims of Pacsai '796 are obvious in view of the level of ordinary skill in the art (Section III.B, *infra*), the scope and content of the prior art including Plaintiff's own tools (Section III.C, *infra*) and the alleged difference between the claimed invention and the prior art (Section III.D, *infra*).  Defendants are entitled to an order granting summary judgment that the claims of Pacsai '796 are invalid.

For these reasons, Defendants request that this Court grant this Motion summarily disposing of Plaintiff's claim for infringement and entering judgment on Defendants' counter-claims of invalidity and noninfringement on these bases; and enter an order dismissing this action with prejudice as to all Defendants.

Under E.D. Mich. LR 7.1(a), there was a conference between counsel for Plaintiff and counsel for Defendants in which the nature of the motion and its legal basis were explained. Concurrence in the relief sought was not obtained.

Dated: <u>January 25, 2008</u>                    /s David A. McClaughry
                                                 HARNESS, DICKEY & PIERCE, P.L.C.
                                                 David A. McClaughry (P48816)
                                                 Michael P. Doerr (P61075)
                                                 5445 Corporate Drive, Suite 200
                                                 Troy, MI 48098-2683
                                                 Phone: (248) 641-1600
                                                 Fax: (248) 641-0270
                                                 mcclaughry@hdp.com
                                                 mdoerr@hdp.com

                                                 *Attorneys for Defendants Bartec USA, LLC, Bartec Auto ID Limited, Schrader-Bridgeport International, Inc., and Myers Tire Supply Distribution, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SPX CORPORATION,
a Delaware corporation,

      Plaintiff,

vs.

                                    Civil Action No. 2:06-cv-14888

BARTEC USA, LLC                           Hon. David M. Lawson
a Michigan company,                      Mag. Judge Steven D. Pepe
BARTEC AUTO ID LIMITED,
a United Kingdom corporation,
SCHRADER-BRIDGEPORT INTERNATIONAL, INC.,
A Delaware corporation,
GENERAL PARTS, INC.,
A North Carolina corporation, and
MYERS TIRE SUPPLY DISTRIBUTION, INC.
An Ohio corporation,

      Defendants.

_____/

**BRIEF IN SUPPORT OF**
**DEFENDANTS BARTEC USA, LLC, BARTEC AUTO ID LIMITED, SCHRADER-**
**BRIDGEPORT INTERNATIONAL, INC., AND MYERS TIRE SUPPLY**
**DISTRIBUTION, INC.'S MOTION FOR SUMMARY JUDGMENT**
**UNDER FED R. CIV. P. 56**

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ................................................................... iv

INDEX OF AUTHORITIES ..................................................................................... v

   I.    ALL ASSERTED CLAIMS ARE INVALID FOR INDEFINITENESS ......................... 1

      A.   Claims 1-15 And 20-22 ..................................................................................... 2

      B.   Conclusion on Indefiniteness ........................................................................... 4

   II.   PLAINTIFF CANNOT ESTABLISH THAT THE ACCUSED TOOLS INFRINGE ANY
       CLAIM OF THE '796 PATENT ........................................................................... 4

      A.   It Is Plaintiff's Burden To Prove Infringement By A Preponderance Of The Evidence  4

      B.   The Accused Tools Do Not Possess Two Or More Different Means And Do Not
          Infringe Any Asserted Claim ............................................................................ 5

          1.   Plaintiff cannot establish that any accused tool has two or more different means
              selected from the enumerated four ................................................................ 5

          2.   Plaintiff's expert admits that the accused tools have only a single structure for
              activating tire sensors ................................................................................... 6

      C.   The Accused Tools Do Not Perform Attempting to Activate / Waiting / Recording /
          Repeating And Do Not Infringe Claims 17-19 ................................................. 8

      D.   The Accused Tools Do Not Perform Transmitting To A Remote Tire Monitoring
          System Receiving Unit And Do Not Infringe Claims 20-22 .............................. 9

      E.   Conclusion On Noninfringement ................................................................... 10

   III.   ALL ASSERTED CLAIMS ARE OBVIOUS IN VIEW OF THE PRIOR ART ........ 10

      A.   Legal Standard of Obviousness ..................................................................... 11

      B.   Level of Ordinary Skill In The Art ................................................................ 12

      C.   All Elements Of The Tire Positioning Tool Claimed In Pacsai '796  Are Found In The
          Prior Art ......................................................................................................... 13

          1.   Remote Tire Monitoring Systems (RTMS) ............................................... 13

          2.   Prior art activation tools .......................................................................... 14

              a.   Plaintiff's TPM Tool ........................................................................ 14

              b.   Bartec BXR Tool ............................................................................ 15

              c.   US '320: Tire Condition Monitoring Apparatus ............................... 16

          3.   GB '074: Universal Data Storage Device reader .................................... 16

      D.   The Difference Between The Prior Art And Claims ....................................... 18

E.  Conclusion On Obviousness ......................................................................................... 20

IV.  CONCLUSION............................................................................................................... 20

## STATEMENT OF ISSUES PRESENTED

ISSUE 1:   Whether claims 1-15 and 17-22 of Pacsai '796 are invalid where the Court has held that the term "means for generating modulated signals" is void for indefiniteness and where the construction of all asserted claims includes "means for generating modulated signals."

Defendants answer yes.

ISSUE 2:   Whether the accused tools infringe any asserted claims of Pacsai '796 (a) where all asserted claims require two or more different means for activating tire sensors but the accused tools only have a single means; (b) where claims 17-19 recite steps of attempting to activate, waiting, attempting again, and repeating, where claims 18-19 recite the step of recording, and where the accused tools do not perform these steps; and (c) where claims 20-22 require the step of transmitting signals to remote tire monitoring system receiving units but the accused tools do not transmit signals to the receiving units.

Defendants answer yes.

ISSUE 3:   Whether all claims of Pacsai '796 are obvious and thus invalid in view of the prior art where all elements of the tire positioning tool claimed in the asserted patent are found in the prior art and the subject matter of the claims would have been obvious to one of ordinary skill in the art at the time of the invention.

Defendants answer yes.

# INDEX OF AUTHORITIES

## Cases

*Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374 (Fed. Cir. 1999) ................. 1, 2

*Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946 (Fed. Cir. 2007) ................. 1, 2, 3

Brown v. 3M; 265 F.3d 1349 (Fed. Cir. 2001) ............................................................... 3

*Budde v. Harley-Davidson, Inc.,* 250 F.3d 1369 (Fed. Cir. 2001) ................................... 2

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303 (Fed. Cir. 1998) ......................................................................................................................... 4

Ecolochem Inc. v. So. Cal Edison Co., 91 F.3d 169 (table, unpublished), 1996 WL 297601, 1996 U.S.App. LEXIS 13330 (Fed. Cir. 1996) ....................................................... 3

*Ex parte Barnard*, 135 USPQ 109 (Pat. Bd. App. 1961) ............................................... 3

*Ex parte Dotter*, 12 USPQ 382 (Pat. Bd. App. 1931) ................................................... 3

*Ex parte Martel and* Stroble, 141 U.S.P.Q. 306 (Bd. Pat. App. and Interf. 1963) ....... 3

*Ex parte White and Cates*, 127 USPQ 261 (Pat. Bd. App. 1958) ................................ 3

*Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371 (Fed. Cir. 2001) ................. 1, 2

*Finistar Core v. The DirectTV Group, Inc.* 416 F.Supp.2d 512 (E.D. Tex. 2006) ....... 2

*In re Harnisch*, 631 F.2d 716 (C.C.P.A. 1980) ........................................................... 3

*Johnston v. IVAC Corp.* 885 F.2d 1574 (Fed. Cir. 1989) ............................................ 5

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. ___, 127 S.Ct. 1727 (2007) ................. 11, 12, 20

*Morton Int'l, Inc. v. Cardinal Chemical Co.*, 5 F.3d 1464 (Fed. Cir. 1993) .............. 3, 4

*Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005) ............ 4

*Research Plastics, Inc. v. Federal Packing Corp.,* 421 F.3d 1290 (Fed. Cir. 2005) ......... 10

*Ryko Mfg Co. v. Nu-Star, Inc*, 950 F.2d 714 (Fed. Cir. 1990) ................................. 11

*Sandt Technology, Ltd. v. Resco Metal & Plastic Corp*., 264 F.3d 1344 (Fed. Cir. 2001) ......... 11

*Storage Tech. Corp. v. Cisco Systems, Inc.*, 329 F.3d 823 (Fed. Cir. 2003) ................. 8

*Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326 (Fed. Cir. 2005) ......... 4

*WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999) ................... 4

**Statutes**

35 U.S.C. § 102 ........................................................................................................... 13
35 U.S.C. § 102(a) ...................................................................................................... 13
35 U.S.C. § 102(b) ................................................................................................ 13, 17
35 U.S.C. § 102(e) ...................................................................................................... 13
35 U.S.C. § 103 ........................................................................................................... 11
35 U.S.C. § 103(a) ...................................................................................................... 11

**Treatises**

1 Chisum, § 3.08 [2][a] (2007) .................................................................................. 15

For the reason detailed below, Defendants request that this Court grant this Motion summarily disposing of Plaintiff's claim for infringement on these bases and enter an order dismissing this action with prejudice as to all Defendants.[1]

## I.      ALL ASSERTED CLAIMS ARE INVALID FOR INDEFINITENESS

"A determination of indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims[, and] therefore, like claim construction, is a question of law." *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999). A claim is indefinite if it is insolubly ambiguous, and no narrowing construction can properly be adopted. *Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

In fulfilling its claim construction duty, this Court held that the claim limitation "means for generating modulated signals" is void for indefiniteness finding that the specification failed to adequately disclose structure corresponding to the claimed function of generating modulated signals. *See* Claim Construction Order, p. 29-31, 37. The legal consequence that flows from this holding is a finding that the claims are invalid under 35 U.S.C. § 112, ¶ 2. *Atmel Corp.*, 198 F.3d at 1378; *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007). This holding provides clear and convincing evidence to support a holding of invalidity under 35 U.S.C. § 112, ¶2. *See* Ex. B, *Biomedino, LLC, v. Waters Technologies, Corp.,* Order Construing Claims of the '502 Patent, Case No. C05-0042L, (W.D. Wash. 2005), p. 11

---

[1] In accordance with the Court's instruction, a boilerplate recitation of the summary judgment standard has not been re-produced herein and statements of materials facts are supported with citation to the record including the exhibits filed herewith. *See*, Order Modifying Case Management Order and Scheduling Order (Dkt. #98), p. 4.

("Because no structure corresponding to the specified function is described, defendants have shown by clear and convincing evidence that the '502 patent fails at the first hurdle.") *aff'd Biomedino*, 490 F.3d at 949. *See also, Atmel Corp.*, 198 F.3d at 1379 (in the context of a means-plus-function claim an analysis under § 112, ¶2 is inextricably intertwined with claim construction); *Exxon Research*, 265 F.3d at 1375. As in *Biomedino*, this Court must hold that the asserted claims are invalid.

### A.    Claims 1-15 and 17-22 are Invalid

All asserted claims have been construed as requiring two or more means selected from the group consisting of "[1] a magnet, [2] a valve core depressor, [3] means for generating continuous wave signals, and [4] **means for generating modulated signals."** Claim Construction Order, p. 11-12 (emphasis added).[2]  Per the Court's claim construction, "means for generating modulated signals" is indefinite. *See also,* Ex. C, Liepa Decl., ¶ 5 (one skilled in the art cannot determine a specific structure or approach for generating modulated signals as claimed in Pacsai '796 because the specification fails to disclose any program, algorithm or instructions given to the microprocessor).

Without any description of the microprocessor's programming or how the microprocessor accomplishes the task of modulating the frequency generating circuitry, one skilled in the art cannot readily ascertain what the claim means. *See, Budde v. Harley-Davidson, Inc.,* 250 F.3d 1369, 1381-82 (Fed. Cir. 2001); *Atmel Corp.,* 198 F.3d at 1382; *Finistar Core v. The DirectTV Group, Inc.* 416 F.Supp.2d 512, 518 (E.D. Tex. 2006). On this clear and convincing evidence

---

[2] Means for generating modulated signals is expressly recited in claims 1-15 and in the stipulated construction of claims 17-22.

the Court must hold that claims 1-15 and 17-22 are in violation of 35 U.S.C. § 112, ¶ 2 and thus invalid. *See, Biomedino,* 490 F.3d at 949; *Morton Int'l, Inc. v. Cardinal Chemical Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993) ("Since the evidence shows that the claims at issue here are not sufficiently precise to permit a potential competitor to determine whether or not he is infringing, we also agree with the district court's determination that the claims are invalid for failure to satisfy the 'definiteness' requirement of section 112, second paragraph.").

The validity of these claims is not preserved by the existence of alternative definite members, i.e., members [1]-[3], where an indefinite member, i.e., member [4], is included in a single group along with members [1]-[3]. A claim written in this form (aka a *Markush* claim)[3] must be **definite** and **complete in scope** as to the group and **each member** in the group, or else the claim as a whole is indefinite. Ex. X, *Ex parte Barnard*, 135 USPQ 109, 110 (Pat. Bd. App. 1961); Ex. Y, *Ex parte Martel and* Stroble, 141 U.S.P.Q. 306 (Bd. Pat. App. and Interf. 1963); Ex. Z, *Ex parte White and Cates*, 127 USPQ 261 (Pat. Bd. App. 1958); Ex. AA, *Ex parte Dotter*, 12 USPQ 382 (Pat. Bd. App. 1931). [4]

Counsel for Plaintiff admitted as much at the *Markman* hearing stating that "If [Defendants'] claim is right that these claims are indefinite and their validity challenge is upheld,

---

[3] Markush was a patent applicant that petitioned the Commissioner of Patents to approve the form of a claim which recited a group consisting of several alternative members (e.g., members [1]-[4]) and to require the examiner to examine it for patentability. See, *In re Harnisch*, 631 F.2d 716, 620 (C.C.P.A. 1980). As a result "*Markush*" became associated with this type of claim expression. *Id.*

[4] Cited authority not published in the federal reports are provided at Exs. X-CC.
*See also*, Ex. BB, Ecolochem Inc. v. So. Cal Edison Co., 91 F.3d 169 (table, unpublished), 1996 WL 297601, *2, 1996 U.S.App. LEXIS 13330, at *6 (Fed. Cir. 1996) ("Accordingly, if either alternative in the Markush group of step three … is anticipated, the entire claim is anticipated."); Brown v. 3M; 265 F.3d 1349, 1353 (Fed. Cir. 2001).

this case is over.  They want to say that there is something left but there is not, because we have agreed to constructions that add these limitations."  Ex. W, *Markman* Hearing Transcript, p. 31, lines 20-24.

### B.     Conclusion on Indefiniteness

There are no genuine issue of material fact that the asserted claims of Pacsai '796 are indefinite and thus invalid.

## II.    PLAINTIFF CANNOT ESTABLISH THAT THE ACCUSED TOOLS INFRINGE ANY CLAIM OF THE '796 PATENT

### A.     Plaintiff Must Prove Infringement By A Preponderance Of The Evidence

To prove infringement, it is Plaintiff's burden to establish, by a preponderance of the evidence, that every limitation in the asserted claims is met.  *Morton Intn'l, Inc. v. Cardinal Chemical Co.*, 5 F.3d 1464, 1468-69 (Fed. Cir. 1993); *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326, 1341, n. 15 (Fed. Cir. 2005).  "If even one limitation is missing or not met as claimed, there is no literal infringement" of that claim.  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1350 (Fed. Cir. 1999).

Further, to establish literal infringement of a means-plus-function claim, it is Plaintiff's burden to prove "that the accused device employs structure identical or equivalent to the structure disclosed in the patent and that the accused device performs the identical function specified in the claim."  *Id.*  To establish infringement under the doctrine of equivalents, it is Plaintiff's burden to prove "that each claim limitation [is] met by an equivalent element in the accused device."  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1311 (Fed. Cir. 1998), *See also, Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005).

Summary Judgment of noninfringement is appropriate where there are no genuine issues of material fact that the accused products do not include every limitation of the claims. *Johnston v. IVAC Corp.* 885 F.2d 1574, 1577 (Fed. Cir. 1989). Plaintiff cannot meet its burden to establish infringement of the '796 patent, either literally or under an equivalency theory.

**B.     The Accused Tools Do Not Possess Two Or More Different Means And Do Not Infringe Any Asserted Claim**

Plaintiff alleges that Bartec's DBL and DEG tools infringe claims 1, 4, 7-12, and 17-19 and that Bartec's DSW tool infringes claims 1, 4, 7-12, and 20-22. *See,* Ex. D, Letter from Tuttle, 1/2/2008, pp. 1-2. All of these asserted claims require two or more different means from the enumerated group of four. [5] *See* Claim Construction Order, pp. 11-12.

The requirement is recited by construction for claims 1-15 and 20-22 as follows: "2 or more different means selected from the following: [1] a magnet, [2] a valve core depressor, [3] means for generating continuous wave signals, and [4] means for generating modulated signals, for activating remote tire monitoring system tire sensors." *See* Claim Construction Order, p. 11. Likewise, the construction for claims 17-19 similarly requires that a first means and a different means each selected from the same enumerated group of four, with the "first means" being different from the "different means." *See* Claim Construction Order, p. 11-12.

**1.     Plaintiff cannot establish that any accused tool has two or more different means selected from the enumerated four**

---

[5] In response to the Patent Examiner's rejection of claims 1 (*See* Ex. E, Office Action, p. 2), the inventors in fact affirmed to the Patent Examiner that two or more means "from the defined group of four" were required in the claimed tool: "The plurality of means for activating tire sensors must be chosen from the defined group of four means: a magnet, a valve core depressor, means for generating continuous wave signals, and means for generating modulated signals. Tools of the present invention may comprise other means for activating tire sensors, but the tools must have two or more from the group of four." Ex. F, Amendment and Response, page 7.

The Court has held that "'Means for generating modulated signals' is void for indefiniteness."[6]  *See* Claim Construction Order, p. 37.  Of the remaining enumerated means, none of the accused tools have a magnet or a valve core depressor.  *See* Ex. C, Decl. of Liepa, ¶ 34.  These facts are not in dispute, as Plaintiff does not contend that any of the accused tools have a magnet or a valve core depressor or an equivalent to either.  *See* Ex. G, Pacsai Expert Report, 10/04/2007, ¶ 15.

***Because the accused tools do not posses two of the remaining three "means," Plaintiff cannot establish infringement of any asserted claim and Defendants are entitled to summary judgment as a matter of law.***  Given that the accused tools do not have a magnet or a valve core depressor, and given that the Court has rendered void for indefiniteness the recited means for generating modulated signals, Plaintiff is unable to establish that any of the accused tools have two or more means from the enumerated group of four.

No genuine issue of material fact remains.  Because the required second or different means is not present, Plaintiff cannot establish literal infringement.  For the same reason, Plaintiff cannot establish infringement based on a theory of equivalents under 35 U.S.C. § 112, ¶ 6 or under the doctrine of equivalents.

### 2.   Plaintiff's expert admits that the accused tools have only a single structure for activating tire sensors

Even setting aside the indefiniteness of the recited means for generating modulated signals, Plaintiff's own expert, Ernest Pacsai, admits that the accused tools have only a single structure for generating signals which activate tire sensors:

---

[6] The basis of non-infringement is presented, in the alternative to Defendants' challenges to the validity of Pacsai '796.

> Q.   Now, is -- in your opinion is the structure that generates a modulated signal in the DBL3 the same structure that generates the continuous wave signal?
>
> A.   Okay.  Say that one more time.
>      (The requested portion of the record was read by the reporter at 2:51 p.m.)
>
> A.   I believe so, yes.

Ex. H, Pacsai Dep., 11/16/2007 (excerpt), p. 73.  Pacsai confirmed that the same analysis was used for the other accused tools.  *Id.* at pp. 74-75.

As discussed above, all of the asserted claims require two or more means from the enumerated group of four.  Pacsai contends that the accused tools have means [3] and [4] from the group of four.  *See* Ex. G, Pacsai Expert Report, 10/04/2007, ¶ 15.  Thus, using the parlance of 35 U.S.C. § 112, ¶ 6, under Plaintiff's theory the accused tools must have two or more "corresponding structure[s]" – one structure for generating continuous waves and one structure for generating modulated signals. 35 U.S.C. § 112, ¶ 6.

According to Pacsai's analysis, the accused tools have just one structure for generating both continuous wave signals and modulated signals.  Ex. H, Pacsai Dep., p. 73.  Pacsai is in agreement with Defendants expert, Dr. Valdis Liepa, that the accused tools have just a single structure, or a single means.  *See* Ex. C, Decl. of Liepa, ¶ 34 ("[T]he accused Bartec tools do not include a magnet or a valve core depressor, and only include a single means (a microprocessor) to produce both continuous wave signals and modulated signals."

The inventors of Pacsai '796 did not (and could not) claim a tool with a single means for generating both continuous waves and modulated signals.  As discussed above, Pacsai *et al*. in fact explicitly disclaimed single means tools:  "Tools of the present invention … ***must have*** two or more from the group of four." Ex. F, Amendment and Response, page 7 (emphasis added).  Plaintiff is now barred by prosecution history estoppel from claiming that the accused single

means / single structure tools infringe under the doctrine of equivalents. *Storage Tech. Corp. v. Cisco Systems, Inc.*, 329 F.3d 823, 836 (Fed. Cir. 2003).

Similarly, Plaintiff is unable to establish infringement based on an equivalents theory under 35 U.S.C. § 112, ¶ 6. While under the Claim Construction Order a microprocessor may be an "equivalent" for "Means for generating continuous wave signals" it cannot be the same structure also relied upon to satisfy the separately claimed "Means for generating modulated signals." Plaintiff is now "barred from asserting any additional equivalents in the future." Claim Construction Order, p. 23. Even if Plaintiff could prove that a microprocessor is an equivalent structure satisfying the "means for generating continuous wave signals" limitation, there is no *additional* structure remaining to satisfy the "means for generating modulated signals" limitation.

There are no genuine issues of material fact. Defendants are entitled to summary judgment of noninfringement as a matter of law as to all asserted claims.

**C.    The Accused Tools Do Not Perform Attempting to Activate / Waiting / Recording / Repeating And Do Not Infringe Claims 17-19**

Claims 17 to 19 each recite a method that includes (1) attempting to activate a remote tire monitoring system tire sensor using a first means; (2) waiting to receive a tire sensor signal; (3) attempting to activate the remote tire monitoring system tire sensor using a different means; and (4) repeating the waiting step and the second attempting step until either a tire sensor signal is received or no different means for activating remote tire monitoring system tire sensors is available. *See* Claim Construction Order, p. 8-9. In addition, claims 18 and 19 recite recording the most recent means used for attempting. *See* Claim Construction Order, p. 9.

Plaintiff presents no evidence that the accused tools perform these steps.  *See* Ex. G, Pacsai Expert Report, ¶ 61-68.  Instead, Plaintiff, through its expert, claims that Defendants admit that these limitations are present by way of Defendants' Interrogatory responses.  *See* Ex. G, Pacsai Expert Report ¶ 66-68.  In responses to Plaintiff's Interrogatories, however, Defendant Bartec USA specifically stated that these limitations <u>are</u> <u>not</u> present.  *See* Exh. I, Responses to Int. No. 3, pp. 11-12.[7]

Plaintiff has not presented any evidence that the accused tools perform the steps recited in claims 17-19 and has not met its burden to establish infringement.  Moreover, Plaintiff does not assert, and cannot establish, infringement of these limitations based on a doctrine of equivalents theory.  Defendants are entitled to summary judgment of noninfringement as to claims 17-19.

### D.  The Accused Tools Do Not Perform Transmitting To A Remote Tire Monitoring System Receiving Unit And Do Not Infringe Claims 20-22

Plaintiff alleges that the DSW tool infringes claims 20 to 22.  *See,* Ex. D, Tuttle letter; Ex. J, Pacsai Supplemental Report, 11/30/2007.  Plaintiff, through its expert, claims that the DSW tool performs "transmitting" when the tool "is connected to a vehicle via the OBDII connector."  Ex. J, *Id.* at ¶ 3.  In other words, Plaintiff's expert claims that the DSW tool performs "transmitting" not via RF communication, as described and claimed in Pacsai '796, but via a wired or direct cable connection to the vehicle's on-board diagnostic connector ("OBDII").

In construing the transmitting limitations of claims 13-16, which are no longer asserted, this Court held that "'Means for transmitting signals to remote tire monitoring system receiving units' is construed to mean 'an antenna connected to transmitting circuitry or transmitter(s) for

---

[7] It is also important to note that Plaintiff did not serve Interrogatories as to Bartec Auto ID's non-infringement contentions.  Pacsai's statement, on its face, is false as to Bartec Auto ID.

transmitting signals to remote tire monitoring system receiving units, with no equivalents." *See* Claim Construction Order, p. 34-35 and 37-38.   The Court's construction of "means for transmitting," in accordance with the specification of Pacsai '796, as directed to radio frequency (RF) communication circuitry informs the meaning of "transmitting" as communicating by radio frequency transmissions. *Research Plastics, Inc. v. Federal Packing Corp.,* 421 F.3d 1290, 1295 (Fed. Cir. 2005), (claim terms must be construed consistently through out the patent).  The DSW tools, on the other hand, do not transmit via RF transmission, and do not include "an antenna connected to transmitting circuitry or transmitter(s)" for transmitting signals to remote tire monitoring system receiving units. *See also,* Ex. C., Liepa Dec., ¶¶ 39-42.

Plaintiff has not presented any evidence that the accused tools perform the step of "transmitting" as recited by Claims 20-22 and has not met its burden on infringement with respect to these claims.  Plaintiff does not, and cannot, make an assertion of "equivalency" to argue that data transfer over a wired cable is an equivalent of "transmitting" as recited by claims 20-22.

### E.      Conclusion On Noninfringement

There are no genuine issues of material fact that the accused tools do not include each and every limitation of the asserted claims, and thus not infringed.

## III.    ALL ASSERTED CLAIMS ARE OBVIOUS IN VIEW OF THE PRIOR ART

The undisputed teachings of the prior art which include Plaintiff's own tire positioning tool, the admitted prior art in Pacsai '796 and a prior art patent which discloses a multi-standard RF data storage device reader demonstrate by clear and convincing evidence that the claims of Pacsai '796 are obvious.

10

### A.      Legal Standard of Obviousness

35 U.S.C. § 103(a) provides:

> A patent may not be obtained … if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to
> which said subject matter pertains.

"Obviousness is a question of law based upon underlying factual determinations." *Sandt
Technology, Ltd. v. Resco Metal & Plastic Corp*., 264 F.3d 1344, 1354 (Fed. Cir. 2001). A patent
is presumed valid, and a challenger must prove those facts which support its invalidity challenge
by clear and convincing evidence. *Ryko Mfg Co. v. Nu-Star, Inc*, 950 F.2d 714, 715-16 (Fed.
Cir. 1990).   A district court may properly grant a motion for summary judgment on patent
invalidity when the factual inquiries into obviousness present no genuine issue of material facts.
*Id.* at 716.

The analytical framework for determining questions of patent invalidity under 35 U.S.C.
§ 103 as established in *Graham v. John Deere Co.*, 383 U.S. 1 (1966) and recently confirmed in
*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. ___, 127 S.Ct. 1727 (2007) are as follows:

> Under 103, the scope and content of the prior art are to be determined; differences
> between the prior art and the claims at issue are to be ascertained; and the level of
> ordinary skill in the pertinent art resolved. Against this background, the obviousness or
> nonobviousness of the subject matter is determined.
>
> *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

The Supreme Court has repeatedly stressed the need to carefully assess a patent based on
the combination of elements found in the prior art.   "The combination of familiar elements
according to known methods is likely to be obvious when it does no more than yield predictable

results." 550 U.S. ___, 127 S.Ct. at 1739. To this end, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id at 1742.*

> "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *Id.*

It is clear from the undisputed facts that a person of ordinary skill in the art, facing the needs created by the proliferation of different types of tire sensors would have found the subject matter as whole claimed in Pacsai '796 (i.e., the combination of multiple single-purpose TPMS tools into a single multi-purpose TPMS tool) obvious as a matter of law. *See Id.* at 1744.

**B.      Level of Ordinary Skill In The Art**

The Court found that the level of ordinary skill in the art requires a working understanding of radio frequency (RF) communication in identification technology systems including the transmitters and receivers incorporated in to such systems and the way in which there components activate and operate. Claim Construction Order, p. 19-20.   *See also,* Ex. C, Decl. of Liepa, ¶¶ 27-28. Defendants point to further undisputed facts in support. *See* Ex. K, Pacsai Dep., pp. 17-22 (experience in field of automotive electronics); Ex. L Szasz Dep., pp. 7-11 (experience in field of automotive electronics); Ex. M, Kochie Dep., pp. 4-6 (experience in electronic test equipment); and Ex. N, McNeill Dep., pp. 6-7 (experience in field of automotive electronics and electronic test equipment). That the level of skill includes RF communications is further supported by the fact that all of the inventors named in Pacsai '796 are also named inventors on U.S. Patent Application Publication No. 2004-0036595 (US '595) entitled "Object Tracking" which relates to the use of RFID technology for tracking objects. *See,* Ex. P, US '595

(¶¶ 0001,0006) (base station capable of transmitting and receiving RF signals with an electronic tag); Ex. K, Pacsai Dep. p. 55.

### C.  All Elements Of The Tire Positioning Tool Claimed In Pacsai '796  Are Found In The Prior Art

"Prior art" refers to the base of knowledge that existed prior to the claimed invention and is defined as subject matter falling within the scope of 35 U.S.C. § 102.  For purposes of this motion, Defendants rely on prior art defined by 35 U.S.C. §§ 102(a), (b) and (e).  Under Section 102(a), the prior art includes any patents or printed publication and any tools known or used by others[8] before December 20, 2002.[9]  Likewise, under Section 102(e), the prior art includes any patent or published U.S. application filed prior to December 20, 2002.  Under Section 102(b), the prior art includes any patents or printed publications issued before April 21, 2002 and also any pertinent products that were in use or on-sale in the United States before April 21, 2002.[10]

### 1.  Remote Tire Monitoring Systems (RTMS)[11]

Tire sensors designed by different manufacturers utilize different methods of activation including (1) activation by magnetic field, (2) activation by a change in tire pressure, and (3) activation by radio frequency or RF signal.  Ex. A, Pacsai '796, 3:43-4:12.  Proliferation of

---

[8] Although Plaintiff is now the "patentee" its prior activities constitute the work of "another" or "others" and thus prior art to Pacsai '796.  *See,* Ex. CC, 1 Chisum, § 3.08 [2][a], p. 3-243 (2007).

[9] *See* Ex. Q, Plaintiff's Response To Bartec AutoID Limited's  First Set of Interrogatories To Plaintiff SPX Corporation, No. 11, p. 9 conceding December 20, 2002 as earliest invention date.

[10] Section 102(b) defines a statutory bar for activities more than one year before the patent application filing date in the United States -- the critical date for Pacsai '796 is April 21, 2002.

[11] Defendants refer to the Court's description of the components and operation of an RTMS set forth in the Claim Construction Order at pages 1-3 rather than repeat it here.

theses systems was occurring, in part due to a proposed federal mandate[12] that would require light vehicles to be equipped with tire pressure monitoring systems which in turn created a need for tools to program these systems. *See,* Ex. O, Kenny Dep., p. 21 (the idea for a tire positioning tool was sparked by the proposed federal rule for TPMS)[13], Ex. M, Kochie Dep., p. 94 (when a new system is mandated, it typically provides opportunity for new tools to be developed).[14]

### 2.    Prior art activation tools

Activation tools capable of activating and reading a particular type of sensor were known and used in the art prior to Pacsai '796.

### a.    Plaintiff's TPM Tool

By the end of 2002, Plaintiff developed and sold a tool to General Motors ("The TPM tool"). *See,* Ex. N, McNeill Dep.,[15] pp. 11-12. The TPM tool generated a continuous wave signal for activating the tire sensor, received a tire sensor signal back from the tire sensors and displayed the data on an LCD display. *Id.* at p. 12. While not incorporated into the TPM tool *per se* Plaintiff also sold a magnet, as a separate option, to activate tire sensors. *Id.* at pp. 12-13. McNeill characterized the original TPM tool as a single activation TPM tool which was later

---

[12] The implementing rules called for a phase-in of TPMS on vehicle manufacturers' light vehicles with 20% compliance from October 5, 2005 to August 31, 2006, 70% compliance by September 1, 2006 and 100% compliance by September 1, 2007. *See*, Ex. R, Executive Summary of 49 CFR Parts 571 and 585.

[13] Thomas Kenny is one of the inventors named in Pacsai '796.

[14] Robert Kochie is SPX's product manager responsible for direct test equipment which includes TPM tools. Ex. M, Kochie Dep., p. 4-6.

[15] Paul McNeill was the 30(b)(6) witness designated by Plaintiff to testify on the topic of Plaintiff's prior art activities. *See*, Ex. N, McNeill Dep., p. 11.

adapted to have multiple activation techniques.  *Id.* at p. 20-21.[16]  Documents from Plaintiff's

production corroborate McNeill's testimony about early TPM tools designed, manufactured and

purchased from a third party supplier.  *See* Ex. S, Tire Pressure Monitor (TPM) Tool, Product

Requirements Document, dated May 14, 1999, p. 2.  *See* Ex. T, TRI Tire Pressure Monitor

Readback Tool Summary, p. 1; Ex. U, Supplier Transaction Documents.

Plaintiff's early TPM tools were "a handheld battery powered tire service tool" that

included a 125 kHz coil and oscillator circuit for emitting a 125 kHz low frequency signal (LF)

at the proper modulation and power level."  Ex. T at p. 1.  The uses for this tool included "re-

learning the position of the tires after service including rotation and repair" as well as to "verify

magnet activation of the tire sensor is functional."  *Id.* at p. 11.  While not integrated into a single

tool, both a magnet and the LF coil and oscillator were known and used by Plaintiff for

activating tire sensors.  *Id.*  Plaintiff's TPM tool also had receiving circuitry capable of receiving

tire sensor signals on 125kHz, 315 MHz and 433 MHz frequencies and an LCD for reading back

data received from the tire sensor.  *See* Ex. S at p. 3; Ex. T at p. 11.

b.      Bartec BXR Tool

Bartec Auto ID Limited, like Plaintiff, was developing tire positioning tools (the

"BXR") in the early 2000s.  For example, in 2000 or 2001, Dominion Technologies of Roseville,

Michigan purchased BXR tools designed to activate tire sensors with continuous wave signals at

various frequencies, and receive a signal back from the tire sensors at various low and high

frequencies.  Ex. V, Mallett Dep., p. 56-57 and Dep. Ex. 64.  By early 2002 Dominion

---

[16] McNeill placed this modification in the 2004-2005 timeframe, before Plaintiff had acquired
the rights to Pacsai '796.  Ex. N, McNeill Dep., p. 21.

Technologies and Bartec Auto ID were working on a modification to the BXR tool that would

enable it to transmit a continuous wave LF signal to activate the tire sensors and a modulated LF

signal to de-activate or change the mode of the tire sensor.  *Id. at* pp. 29-31 and Dep. Ex. 56.

<u>c.      US '320: Tire Condition Monitoring Apparatus</u>

U.S. Patent Application Publication No. 2003/0121320 A1 (US '320), Ex. C2 entitled

*Tire Condition Monitoring Apparatus* describes a tire pressure monitoring system that includes a

handheld positioning tool.[17]  The system described in US '320 includes a tire sensor (termed "a

transmitter"), a receiving unit (termed "a receiver") and a hand tool (termed "a commander").

*See*, Ex. C, Liepa Decl., ¶¶ 24-26.  Ex. C2, US '320, ¶ 0008.  The hand tool or commander

operates as a tire positioning tool in the TPMS described in US '320 and is capable of

transmitting an activation signal to the tire sensor (Ex. C2, US '320, FIGS. 4 and 5, ¶¶ 0026,

0028; Ex. C, Liepa Decl., ¶ 24), receiving a tire sensor signal from the tire sensor (Ex. C2, US

'320, FIG. 5, ¶¶ 0036, 0038; Ex. C, Liepa Decl., ¶ 25), and transmitting a signal with sensor

identification data to the receiving unit (Ex. C2, US '320, FIGS. 4 and 5, ¶¶ 0028, 0036, 0044;

Ex. C, Liepa Decl., ¶26).  The type of data (e.g., tire condition data, sensor ID, vehicle ID or tire

position) that can be added to the signal is not dictated by the tool but rather a particular TPM

application.  Thus, the commander disclosed in US '320 functions in the same way as tire

positioning tool described and claimed in Pacsai *et al,* albeit not expressly with tire sensors of

different manufacturers.

**3.      GB '074: Universal Data Storage Device Reader**

---

[17] Plaintiff does not dispute the prior art status of US '320.  *See* Ex. Q, Plaintiff's Response To
Bartec AutoID Limited's  First Set of Interrogatories To Plaintiff SPX Corporation, No. 11, p. 9.

Published British Patent Application No. 2,305,074 (GB '074), Ex. C3 entitled *Apparatus for Remotely Reading Data Storage Devices* describes a multi-purpose interrogator or reader for communicating with data storage devices produced by different manufacturers.[18]  *See* Ex. C3, GB '074, 4:3-16[19]; Ex. C, Liepa Decl., ¶ 14.  GB '074 discloses a solution to the problem of incompatibility between the communication protocols of various manufacturer's data storage devices with a multi-standard or universal tool. *See* Ex. C3, GB '074, 5:2-9; Ex. C, Liepa Decl., ¶ 13.  GB '074 also discloses a method searching through various frequencies and protocols to activate and communicate with different data storage devices.  *See* Ex. C3, GB '074, 5:10-16; Ex. C, Liepa Decl., ¶ 15.  The multi-purpose reader disclosed in GB '074 includes:

- <u>Activation Means:</u> frequency generating circuitry for generating various types of activation signals including a continuous wave (CW) signal or a modulated signal. *See* Ex. C, Liepa Decl., ¶¶ 16-18; Ex. C3,  GB '074, 12:21-25, 29:23-24, 36:21-23.

- <u>Receiving Means:</u> an antenna and receiving circuitry for receiving and decoding signals received from the RFID tag.  *See* Ex. C, Liepa Decl., ¶19; Ex. C3,  GB '074, 3:5-9.

- <u>Transmitting Means:</u> an interface to communicate with another system such as a host computer via a cable; or alternately a transmitter sending RF signals for writing data to the RFID tag.  See, Ex. C, Liepa Decl., ¶ 21; Ex. C3,  GB '074, 3:8-9, 27:4-27, 43:6-7.

- <u>Display Means:</u> LEDs.  See, Ex. C, Liepa Decl., ¶ 20; Ex. C3, GB '074, 28:6-15.

- <u>Protocol Searching:</u> attempting to activate the RFID tag with a CW signal at 125 kHz and awaiting a response; if unsuccessful, attempting to activate the RFID tag using a

---

[18] Remote tire monitoring is a specific application of radio frequency identification (RFID) in which the tire is equipped with a sensor id tag that acquires pressure, temperature, or other tire data.  *See, e.g.,* Ex. C4, Howell et al., GB 2,308,947 (describing RFID tag with a sensor for measuring temperature or pressure which is remotely interrogated by a reader).  Ex. C, Liepa Decl., ¶12.

[19] This application published on March 26, 1997 qualifies as prior art under 35 U.S.C. § 102(b). Citations to GB '074 are made by page and line number (p:ln-ln or p:ln-p:ln).

CW signal at 134.2 kHz, and awaiting a response; and if unsuccessful, attempting to activate the RFID tag with a modulated signal, and awaiting a response. The protocol search proceeds until the RFID tag is successfully read or there are more known protocols to attempt.  See, Ex. C, Liepa Decl., ¶¶ 15, 23.  Ex. C3,  GB '074, 5:10-16, 29:14-30:3, 36:21-23 and 37:19-23.

As clearly evidenced above, a person of ordinary skill would know of tire positioning tools which activate a particular tire sensor, receive tire sensor signal, display data from the tire sensor signal, transmit signals to the RTMS receiving unit and receive signals transmitted signal from the RTMS receiving unit.   The person of ordinary skill would also know of multi-purpose or universal tools and a method of programmed searching through the various known communication protocols.

**D.    The Claimed Invention Is Not A Patentable Advancement Over The Prior Art**

In view of the scope and content of the prior art described above, it is clear that the difference, if any, between the prior art and the claims in Pacsai '796 resides only in the combination of these known elements into a single tool capable of activating a plurality of tire sensors, each of the plurality of tire sensors utilizing a different method for activating the said tire sensor.  Pacsai *et al.* admitted as much characterizing their invention as a tool that "provides for a tire positioning tool that can be utilized ***to work with remote tire monitoring systems made by difference manufacturers"***, and is "capable of activating RTMS tire sensors using one of a plurality of means."  Ex. A, Pacsai '796, 2:49-53 (emphasis added).  In obtaining allowance of their patent, Pacsai *et al*. further characterized their contribution to the art as the recognition of ***a need for a tool that communicates with tire sensors produced by different manufacturers*** having different communication protocols -- a single tool that can activate tire sensors produced

18

by various manufacturers.  Ex. A, Pacsai '796, 2:23-38, 2:49-51, 6:33-36; Ex. F, Amendment and Response, p. 9.  *See* also, Ex. C, Liepa Decl., ¶ 11.

Pacsai *et al.* were not, however, the first in this art to recognize this problem or arrive at this solution -- at least *Howell et al*. were ahead of them:.

> Currently, there is no common carrier modulation and data transmission system agreed between manufacturers for such transponders and the systems chosen by different manufacturers of tags and readers vary widely and are generally incompatible with one another.  This incompatibility means that a reader made by one manufacturer for reading a particular tag or transponder will not normally be able to read tags or transponders manufactured by another supplier.

> Ex. C3, GB '074, 4:3-11.

> Embodiments of apparatus and a method in accordance with the present invention enable a number of different data storage devices, each using a different modulation and/or data transmission system, to be interrogated and read … and thus enable retrieval of the data transmitted by the data storage device.

> Ex. C3, GB '074, 7:-16.

Pacsai *et al.* further admit that all of the components of their tire positioning tool were well known in the art and readily incorporated into tire positioning tools by one of ordinary skill in the art:  [1] Activation Means: including a magnet (4:43-47), a valve core depressor (4:59-61), frequency generating circuitry for generating continuous wave signals (5:14-22) and a microprocessor and frequency generating circuitry for generating modulated signals (5:50-57); [2] Receiving Means: including receiving circuitry for receiving a signal from either the tire sensor or the remote receiving unit (7:37-42) at common frequencies -- e.g., 125kHz, 345 MHz and 433 MHz (7:63-67); [3] Transmitting Means: including transmitting circuitry for transmitting signals to the remote receiving unit (8:65-9:1) at common frequencies -- e.g.,

125kHz, 345 MHz and 433 MHz (9:22-35); and [4] Display Means: including an LED display or an LCD display (10:60-63).  Ex. A, Pacsai '796.  See also, Ex. C, Liepa Decl., ¶¶ 6-10.

As charted in Table 1 at Ex. DD, the admittedly known elements used by Pacsai *et al.*, the interrelated teachings of the prior art and the need for a universal tool sparked by enactment of the TREAD Act and the proliferation of RTMS clearly establish that a universal tire positioning tool which can operate with a plurality of tire sensors using different methods of activation is not a real innovation worthy of patent protection.  *See, KSR Int'l*, 550 U.S. ____, 127 S.Ct. at 1741.  This combination of familiar elements according to known methods and yielding predictable results was obvious, and therefore not patentable.  *Id.* at 1739.

      **E.**     **Conclusion On Obviousness**

There is no genuine issue of material fact that each of the claims as well as the subject matter as a whole claimed in Pacsai '796 is obvious in view of the prior art.

**IV.**    **CONCLUSION**

For these reasons, Defendants request that the Court grant this Motion and enter an order dismissing this action with prejudice as to all Defendants.

| | |
|---|---|
| Dated: <u>January 22, 2008</u> | <u>/s David A. McClaughry</u><br>HARNESS, DICKEY & PIERCE, P.L.C.<br>David A. McClaughry (P48816)<br>Michael P. Doerr (P61075)<br>5445 Corporate Drive, Suite 200<br>Troy, MI 48098-2683<br>Phone: (248) 641-1600<br>Fax: (248) 641-0270<br>mcclaughry@hdp.com<br>mdoerr@hdp.com<br><br>*Attorneys for Defendants Bartec USA, LLC, Bartec Auto ID Limited, Schrader-Bridgeport International, Inc., and Myers Tire Supply Distribution, Inc.* |

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2008, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will be served by operation of the Court's electronic filing system upon the following:

Marc Lorelli – mlorelli@brookskushman.com

I hereby certify that on January 25, 2008, I served the under seal exhibits via first class mail upon the following:

Marc Lorelli, Esq.
Brooks Kushman P.C.
1000 Town Center
Twenty-Second Floor
Southfield, MI 48075

By:   /s David A. McClaughry
HARNESS, DICKEY & PIERCE, P.L.C.
David A. McClaughry (P48816)
Michael P. Doerr (P61075)
5445 Corporate Drive, Suite 400
Troy, MI 48098-2683
Phone: (248) 641-1600
Fax: (248) 641-0270
mcclaughry@hdp.com
mdoerr@hdp.com

*Attorneys for Defendants Bartec USA, LLC, Bartec Auto ID Limited, Schrader-Bridgeport International, Inc., and Myers Tire Supply Distribution, Inc.*